IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRIAN H. GALLE, | : |
| | :    CIVIL ACTION NO.: |
| Plaintiff, | : |
| | :    02-4622 |
| v. | : |
| | : |
| DEPARTMENT OF GENERAL SERVICES ET AL., | : |
| | : |
| Defendants. | : |

**PLAINTIFF'S AMENDED BRIEF IN RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff, Brian Galle brings this action under the Rehabilitation Act of 1973 as amended to redress unlawful employment practices on the part of his employer, Department of General Services (DGS), Commonwealth of Pennsylvania and for the violation of his constitutional right to privacy of his medical records. Currently before this Court is defendants' motion for summary judgment.

**COUNTER STATEMENT OF THE CASE**

Plaintiff, Brian H. Galle is employed by Defendant DGS as a "Clerk I" (Exhibit A, Galle Deposition at 117). The events giving rise to this case do not surround Mr. Galle's ability to perform the essential functions of this position, his job performance, or his ability to work in general, as DGS would have this Court believe. To the contrary, the events of this case focus on *defendants'* conduct and the hostile working environment Mr. Galle has been subject to since experiencing an epileptic seizure on the job in November of 2000 (Exhibit A, Galle Deposition at 41, 241-245).

1

On or about November 30, 2000, Mr. Galle experienced an epileptic seizure while working at his desk at DGS (Exhibit A, Galle Deposition at 41). As a result of this seizure he was taken to the hospital where he received medical treatment (Exhibit A, Galle Deposition at 45-46). Defendant Keen was aware that this seizure occurred because a report was filed with the capital area police and forwarded to them by Lieutenant Patrick Dougher (Exhibit B, Keen Deposition at 25-27). It must also be noted that defendant Keen describes his job duties to include providing "security" at the DGS building located on Spring Garden Street in Philadelphia Pennsylvania (Exhibit B, Keen Deposition at 26). He is the building administrator. In this capacity, he was called to the scene on the day of Mr. Galle's seizure (Exhibit B, Keen Deposition at 25-27).

Following this seizure, the environment in which Mr. Galle worked changed dramatically (Argument pgs. 9-14 infra.). Almost immediately, DGS reported his seizure to the Pennsylvania Department of Transportation (PennDOT) (Exhibit A, Galle Deposition at 177). This reporting was memorialized in an e-mail of 3/21/01 (Exhibit C, e-mail report). As a result of this reporting, his driver's license was temporarily revoked (Exhibit A, Galle Deposition at 149). Mr. Galle was required to have his neurologist complete a "convulsive disorder reporting form", and certify that despite his epilepsy, he is able to drive a motor vehicle (Exhibit A, Galle Deposition at 148). His driving privileges were not restored until August 1, 2001, and he was not notified of their restoration until sometime subsequent to that date (Exhibit D, PennDot form dated 8/1/01). In March of 2001, despite his understanding that he needed a computer in order to track and send packages sent via United Parcel Post (UPS), Mr. Galle's computer was removed from his work station (Plaintiff's Complaint, ¶ 19). While having received

2

satisfactory performance appraisals in the past, in May 2001 Mr. Galle was appraised by defendant Keen as displaying "need improvement" work performance (Plaintiff's Complaint ¶ 18). Mr. Galle's job description was later changed to reflect that he must posses a valid driver's license (Exhibit A, Galle Deposition at 187-188). Soon after, on August 9, 2001, plaintiff's desk, chairs, heater, and personal belongings contained in his desk were removed from his work space without explanation (Exhibit A, Galle Deposition at 212-213, 218-221). Throughout these nine months, Mr. Galle was subject to demeaning comments about his disability including comments by defendant Wade regarding his occasional tendency to "zone out" or dose off at work (Exhibit A, Galle Deposition at 182, 238).

On December 21, 2001, Mr. Galle, though his Counsel, complained to defendant Keen regarding the disability-based harassment he was experiencing, and the hostile work environment he was subject to (Exhibit E, letter of 12/2101). Neither DGS nor defendant Keen responded to this correspondence until some three months later in March of 2002 (Exhibit B, Keen Deposition at 33) (Argument pgs. 9-14 infra.). During this time, the harassment continued. Rather than respond by taking meaningful remedial action to correct the harassment, defendants initially ignored Mr. Galle's complaint, and subsequently retaliated against him by removing his customary job duties as a mail clerk from him, and instead delegating him to an area of DGS known as the "penthouse" where he was required to punch out new photo identification cards for employees, where he was segregated from his co-workers (Galle Deposition at 234, Plaintiff's Complaint, ¶ 25 and ¶29).

3

Mr. Galle filed the instant action on July 11, 2002 (Plaintiff's Complaint at pg. 7). The hostile work environment he complained of continues up to the present day (Exhibit A, Galle Deposition at 274). In addition, following the filing of this action, Mr. Galle was forced to file a retaliation and discrimination complaint with the Pennsylvania Human Relations Commission (PHRC) (Exhibit J PHRC Complaint).

**ARGUMENT**

**A. Plaintiff can establish that defendant DGS is a "recipient of federal financial assistance", and therefore it must comply with the requirements of the Rehabilitation Act.**

The Rehabilitation Act provides that, "No otherwise qualified individual with a disability. . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. . . ." 29 U.S.C. § 794. As an initial matter, defendant DGS argues that plaintiff's Rehabilitation Act claims must fail because DGS does not receive federal financial assistance. This assertion is contrary to both the evidence gathered in discovery, and relevant caselaw interpreting what it means to "receive" federal financial assistance.

Here, DGS argues that it does not "receive" federal financial assistance because it is not in a position to decide whether to "accept or reject" the federal funds that flow to agencies that it serves (defendant's brief at 11). In support of this proposition, defendants rely upon the Supreme Court's decision in <u>United States Dep't of Transportation v. Paralyzed Veterans of America</u>, 477 U.S. 597, 605 (1986). Defendant's reading of this case misses the mark. In <u>Paralyzed Veterans</u>, the Court makes clear that it is the "contractual nature" of the situation that imposes the

obligation to comply with the Rehabilitation Act.  Id.  Further, it is well established that the federal money need not flow directly to DGS, it need only flow to the Commonwealth.  Id at 607.  See also Herman v. United Brotherhood of Carpenters, 60 F.3d 1375, 1381 (9th Cir. 1995).  Discovery in this action uncovered several memos in which DGS provides services to other agencies through agreements with other state agencies who reimburse DGS directly with federal money.  A review of these memos shows that DGS enters into these agreements with full knowledge that it will pay certain expenses up front, and later be reimbursed through federal funds (Exhibits F, and H).  By way of example, during the period July 7, 1999 through December 15, 2002, DGS managed a "Federally related capital construction project for the Department of Labor and industry".[1]  **Documents related to this project, including a Memorandum of understanding between the Department of General Services and the Department of Labor and Industry are attached hereto as Exhibit G.  According to this documentation, "L & I will receive certain federal funds over a four-year period which may be applied to the installation of sprinklers. . . . L & I has expressed its willingness to reimburse the department in the amount of the federal funds".**[2]  **Further, a memo of April 17, 1998 from the Department of Labor and Industry formalizing this agreement states that, "we [L&I] will need from the Department of General Services a breakdown of**

---

[1] DGS entered into similar agreements with the Commonwealth's Department of Veteran's and Military Affairs for the time period July 1, 2000 through June 30, 2001.  A copy of this documentation is attached hereto as Exhibit F.

[2] While DGS and L&I did not ultimately enter into this particular Memorandum, the Memorandum reflects that they agreed to the terms of a separate memo date April 17, 1998.  This memo expressly states that, federal funds will be committed to the Department of General Services for this project.  A copy of this memo is included as part of Exhibit G.

**the applicable costs,** *which can be identified to these federal funds"* (emphasis added). Thus, DGS participates directly in the decision-making process surrounding whether it will accept L & I's commitment of these funds, and what costs these funds will be used to cover.

Similarly, on September 24, 2001, the Commonwealth's department of Military and Veteran's Affairs entered into an agreement with DGS under which DGS would receive reimbursement of federal funds in the amount of $2,906,622. The memo also makes clear that DGS is obligated to comply with federal billing requirements. A copy of this memo and supporting documents are attached hereto as Exhibit H.

Finally, defendants' designated deponent, pursuant to F.R.C.P. 30(b)(6) testified that, the "source of funding" for projects that it works on with the Department of Military and Veteran's affairs may be the federal government (Exhibit I, deposition of Barbara Sexton at 37-38).

**B. Plaintiff sets forth a prima facie case of hostile work environment harassment on the basis of disability in violation of the Rehabilitation Act.**

    **1. Plaintiff is a qualified individual with a disability[3]**

It cannot be disputed that Mr. Galle is an individual with a disability. He can show that (1) he has a physical or mental impairment, and (2) that his impairment "substantially limits one or more major life activities." 29 U.S.C. § 705(20)(B)(i); 42 U.S.C. § 12112.[4] It is beyond dispute that plaintiff has been diagnosed with a seizure

---

[3] In addition to showing that he is substantially limited in one or more major life activities, Mr. Galle must show that he is "qualified" for his position as a Clerk I. Defendants do not dispute his qualifications for the position.

[4] It is well established that claims brought under the Rehabilitation Act will be analyzed in substantially the same manner as those brought under the Americans with Disabilities Act (ADA). See e.g., Kelly v. Drexel University, 94 F.3d 102, 105 (3d Cir. 1996).

condition known as epilepsy (Exhibit A, Galle Deposition at 38, Exhibit K medical form).  This condition has been expressly recognized as an "impairment" by the interpretive guidance implementing both the Rehabilitation Act and Title I of the ADA.  <u>See</u> 34 C.F.R. pt. 104; ADA Title I Interpretive Guidance § 1630.2(h).  In fact, in its motion for summary judgment, defendants do not dispute that plaintiff has an "impairment" (defendants' motion at 13).  Instead, defendants argue that Mr. Galle's epilepsy does not cause him to be "substantially limited in one or more major life activities."  Such an argument is nothing short of ridiculous, given Mr. Galle's deposition testimony concerning the overall impact of his disability (Exhibit A, Galle Deposition at 263-267).

      Defendants also suggest that Mr. Galle cannot establish disability simply because he is able to engage in the major life activity of working.  This argument not only seeks to penalize Mr. Galle for becoming a productive and integrated member of the community and the workforce, but also conveniently overlooks a host of major life activities recognized by the ADA.  The United States Supreme Court has recognized that, consistent with Equal Employment Opportunity Commission (EEOC) guidelines interpreting the ADA, "substantially limits" means "(i) unable to perform a major life activity that the average person in the general population can perform; *or (ii) significantly restricted as to the condition, manner or duration under which the average person in the general population can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity*.  29 C.F.R. 1630.2(j)(1) (emphasis added); <u>see also</u> <u>Murphy v. United Parcel Services</u>, 527 U.S. 516 (1999).  Defendants suggest that

7

Mr. Galle must be *unable* to engage in a particular activity in order to be substantially limited. This argument is contrary to the Supreme Court's holding in <u>Bragdon v. Abbott</u>, 524 U.S. 624 (1998). In <u>Bragdon</u>, the Court expressly noted that determination of disability does not hinge on "utter inability", and that a plaintiff need *not* demonstrate that a limitation is insurmountable in order to demonstrate substantial limitation. <u>Id</u> at 641. At his deposition, Mr. Galle clearly testified as to the impact of his epilepsy on his day-to-day life (Exhibit A, Galle Deposition at 263-267). Specifically, he testified that, he takes a medication called Carbatrol to help control his seizures (Exhibit A, Galle Deposition at 42). He has also taken several other similar medications for the same purpose (Exhibit A, Galle deposition at 74, 37-43). While the Carbatrol helps the seizures to occur less frequently, it does not eliminate them completely (Exhibit A, Galle Deposition at 43). His ability to sleep, concentrate, interact with others, and care for his children are all impacted by the side effects of his seizure medication (Exhibit A, Galle Deposition at 263-267). Under the Supreme Court's decision in <u>Sutton v. United Airlines Inc</u>, "mitigating measures" such as medication must be considered when determining if an individual is "substantially limited". 527 U.S. at 482 (1999). In considering "mitigating measures", the Court must look at both the positive and negative effects of a particular mitigating measure. <u>Id</u> at 471. In this case, Mr. Galle's deposition testimony makes clear that his medication carries with it side effects which are substantially limiting. Regarding concentration, Mr. Galle testified that, "I can lose my train of thought a little easier. It just takes a little bit of practice to work around it which, unless you are really working on it, can be a pain" (Exhibit A, Galle deposition at 264-65). The medication also causes fatigue, and causes him to "require a lot more sleep than

8

most people do at [his] age, at least. . ." (Exhibit A, Galle deposition at 264). He also experiences "sexual dysfunction" which has caused his "relationship with [his] wife to really [go] downhill" (Exhibit A, Galle deposition at 263-64). It is well established that the determination of disability must be made based upon an assessment of the entire person. It must be carried out not by looking at whether the individual can accomplish a certain goal or task, but whether the individual encounters certain disability-related obstacles in the process. See Gillen v. Fallon Ambulance Service Inc., (01-1642, 1st Cir., March 19, 2002) (citing Albertson's Inc. v. Kirkingburg, 527 U.S. 555 (1999), Sutton v. United Airlines Inc., 527 U.S. 471 at 483 (1999)). There can be no dispute that he is substantially limited.

### 2. Plaintiff was subject to unwelcome harassment on the basis of his disability

Claims for disability-based harassment have been interpreted the same as those involving a sexually hostile environment in violation of Title VII. See e.g., Walton v. Mental Health Association of Southeastern Pennsylvania, 168 F.3d 661 (3d Cir. 1999). Mr. Galle must show that (1) he is a qualified individual with a disability, (2) that he was subject to unwelcome harassment because of his disability, or a request for accommodation, (4) that the harassment was sufficiently severe or pervasive to alter the conditions of his employment, and to create an abusive working environment; and (5) that DGS knew or should have known about the harassment and failed to take prompt remedial action to correct it. Id (citing McConathy v. Dr. Pepper/Seven Up Corp., 131 F.3d 558, 563 (5th Cir. 1998); Vendetta v. Bell Atlantic Corp, (Civ. Action No.: 97-4838) 1998 WL 575111 at *9 (E.D. Pa. 1998).

9

The fact that Mr. Galle is a qualified individual with a disability cannot be disputed and will not be discussed again here (See Discussion at part B above). "Severe and pervasive" harassment is that which is "objectively hostile or abusive, and [is] perceived [by plaintiff] as a hostile or abusive environment" See Walton, 168 F.3d at (3d Cir. 1999) (quoting Harris v. Forklift Systems Inc., 510 U.S. 17, 22 (1993). In determining whether the harassment alleged meets this standard, a court must consider "all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance" Id. Mr. Galle has experienced a course of disability-based harassment that continues up until today. By his own testimony, his work experience since November 30, 2000 has been plagued by harassment including, the reporting of his disability to PennDot, followed by the revocation of his driver's license, disability-related comments by his supervisors, the removal of his space heater and furniture from his office, and segregation to an area of DGS known as the "penthouse", where he was relieved of his job usual job duties as a Clerk I, and instead required to assist with the creation of new employee I.D. cards (Exhibit A, Galle deposition at 151-53, 215-220). While improving slightly, this conduct has persisted for over two years and continues to the present day (Exhibit A, Galle Deposition at 274).

Defendant attempts to rely upon this Circuit's decision in Walton to support its argument that Mr. Galle simply has not been harassed (defendants' brief at 16-18). In so doing, DGS attempts to isolate the instances of harassment Mr. Galle has experienced and continues to experience today. Defendant's attempt to paint the situation as merely a

10

series of isolated incidents is contrary to both the Supreme Court's decision in <u>Harris</u>, and the facts of this case.

There can be no material issue of fact concerning whether DGS knew or should have known of the harassment Mr. Galle complained of, or that they failed to take *any remedial action* to correct the harassment (Exhibit B, Keen Deposition at 23-24, 33). The Third Circuit has recognized that remedial action must be "reasonably calculated" to prevent further acts of harassment. <u>See</u> <u>Knabe v. Boury Corp.</u>, 114 F.3d 407, 411-13 (3d Cir. 1997) (citing <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1486 (3d Cir. 1990)). DGS cannot meet this standard. The record makes clear that on December 21, 2001, Mr. Galle through his Counsel, notified defendant Keen of the harassment he was experiencing (Exhibit E, letter of December 21, 2001). Defendant Keen acknowledges both his receipt of the letter, and that he did not respond to the letter, or to Mr. Galle regarding the harassment he complained of (Exhibit B, Keen Deposition at 31-33). Defendant Keen has responsibility for responding to complaints of harassment (Exhibit B, Keen Deposition at 23). When asked about any investigation he may have conducted in response to Mr. Galle's complaint, Keen responded that "[he] looked into the allegations and found that they were not true". Further, as part of his "investigation", he did not even interview Mr. Galle regarding his concerns (Exhibit B, Keen Deposition at 33). Discovery has not uncovered one shred of documentary evidence to support a conclusion that he conducted any investigation whatsoever. Much less, any investigation designed to result in prompt remedial action. <u>Id</u> at 33. When questioned about the concerns raised in the December 21, 2001 letter, defendant Keen testified as follows:

> **Q: Once you became aware of Mr. Galle's complaints, did you do anything in response?**

11

**A: No, business is [sic] normal.**

**Q: Let me ask you a more specific question, did you do anything to correct, or try to correct the harassments he was complaining of?**

**A: I don't believe he was receiving harassments.**

*****

**Witness: Please ask the question again.**

**Q: When you received Mr. Galle's complaint, did you do anything to try to correct the harassments he was complaining of?**

**A: How could I correct something that wasn't happening?**

*****

**Witness: You can't fix a flat tire if it isn't flat.**

**(**Exhibit B, Keen Deposition at 23-24).

Where, as here, defendant fails to act, plaintiff can prove a disability-based hostile environment in violation of the Rehabilitation Act.

**C. Plaintiff was discriminated against because of his disability in violation of the Rehabilitation Act.**

Mr. Galle can establish a viable claim for discrimination because of his disability. He must show that (1) he is an individual with a disability, (2) he is qualified to perform the essential functions of his position as a Clerk I with or without a reasonable accommodation, and (3) he suffered an adverse employment action because of his disability. See e.g. Menkowitz v. Pottstown Memorial Medical Center, 154 F.3d 113,123 (3d Cir. 1998).

As discussed above, plaintiff can establish that he is an individual with a disability, and his ability to perform the essential function of the Clerk I position is

not in dispute (defendants' brief at 14). Interestingly, defendant DGS does not offer any "legitimate non-discriminatory" reason for all of the unlawful conduct discussed above. Instead, defendants simply argue that plaintiff's claim must fail because he has suffered no adverse employment action.

Adverse employment action is an action that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." See e.g., Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997). It is in no way limited to those instances where an employee is fired, or loses money or other employment benefits. Id.

In the instant case, the terms and conditions of Mr. Galle's employment have clearly changed because of the hostile work environment and discrimination he has experienced. Following his November 30, 2000 seizure, his entire work setting was changed (including moving his work location from a 11x13 foot room to an 8x8 foot room), and he was temporarily relieved of his normal duties as a mail clerk (Exhibit A, Galle deposition at 161-64, 234-35). Finally, he was denied an opportunity to take a position as a tax examiner following an adverse reference from defendant Keen (Exhibit A, Galle Deposition at 252).

**D.   Plaintiff sets forth a claim for retaliation in violation of the Rehabilitation Act, following his complaints of disability-based harassment.**

In order to establish his claim for retaliation, Mr. Galle must prove that (1) he engaged in a protected activity, (2) he experienced an adverse action by the employer either after or contemporaneous with his protected activity; and (3) a causal connection between his protected activity and the employer's adverse action. See

13

e.g., Shellenberger v. Summit Bancorp, 2003 U.S. App. LEXIS 1308 (3d Cir. 2003); Krouse v. American Sterilizer Co., 126 F. 3d 494, 500 (3d Cir. 1997).

Mr. Galle engaged in protected activity on December 21, 2001 when he complained of the disability-based harassment he was experiencing. In response to his complaint, he was met with adverse employment actions including being relieved of his normal job duties as a mail clerk and instead being detailed to the "penthouse" to prepare state employee I.D. cards, and retaliatory harassing comments by his supervisor defendant Wade (Exhibit A, Galle Deposition at 234-241). Mr. Galle can establish temporal proximity between his hostile environment complaint and these actions by defendants. The events complained of began in March of 2002, within just months of Mr. Galle's formal complaint. Further, Mr. Galled filed this lawsuit on July 11, 2002 (Plaintiff's Complaint at pg. 7). Following the filing of this suit, the retaliatory harassment he experienced escalated to the point that he was forced to file a complaint with the Pennsylvania Human Relations Commission (PHRC). A copy of this complaint is attached hereto as Exhibit J.

**E. Plaintiff can establish a claim for a violation of his right to privacy.**

It cannot be disputed that plaintiff's epilepsy was disclosed to the department of transportation. While defendant Keen denies any role in this disclosure, several facts are clear: Keen responded to the scene and witnessed plaintiff's seizure on November 30, 2000 (Exhibit B, Keen Deposition at 25-27). He then contacted EMS and the police were called, ultimately leading to the disclosure of information related to Mr. Galle's disability to the Department of Transportation through DGS electronic mail (Exhibit B, Keen Deposition at 25-27, Exhibit C, e-mail report).

Defendants argue that DGS had a legitimate interest in public safety that necessitated disclosing Mr. Galle's seizure. This argument makes two erroneous assumptions born out of myth, fear and stereotype about Mr. Galle and his disability. First, simply because he has been diagnosed with epilepsy and experienced a seizure, he has a "mental or physical disability. . . affect[ing] his ability to drive safely", or that he has "an uncontrolled seizure disorder" that indicates he "does not meet the medical regulations for safe driving" and would require a report from a physician. Plaintiff's neurologist makes clear that he is safe to drive (Exhibit K, medical report). Second, that there is a duty on the part of an employer such as DGS, or a supervisor such as Mr. Keen to report Mr. Galle. Such an obligation simply does not exist. To the contrary, the Pennsylvania Code makes clear that there are two limited groups of individuals with a *duty* to disclose such disabilities. These are "all physicians and other personnel authorized to diagnose or treat disorders and disabilities defined by the Medical Advisory Board" and persons "in charge of every mental hospital, institution or clinic, or any alcohol or drug treatment facility. . . ." 75 Pa.C.S.A. §1518(b).

While the code also recognizes that reports are sometimes made by others, Pennsylvania Law puts in place a clearly defined procedure to ensure that such reports are kept confidential. The law provides that concerns regarding driver safety be directed to the Department of Transportation's "Medical Unit". The law recognizes the medical unit as playing an important role in ensuring that the report has a legitimate basis and is not made because of "animosity" or "hostility". 67 Pa Code § 82.8. Here, there is no evidence that the procedure set forth in the law was

15

followed. To the contrary, Mr. Galle's seizure was disclosed to the Pennsylvania Department of transportation directly, allowing for no protection of his privacy right, and no mechanism to ensure that the alleged concern of DGS was legitimate (Exhibit C, e-mail report).

In a last ditch effort to excuse themselves from liability for this privacy violation, defendants argue that Keen is entitled to qualified immunity for his disclosure. Neither DGS nor Keen is excused from this violation under the doctrine of "qualified immunity." Qualified immunity applies only in those limited instances where the right at issue is not "clearly established". The right to privacy of ones medical information is clearly established. See e.g., Bolden v. SEPTA, 953 F.2d 807, 831 (3d Cir. 1991); Whalen v. Roe, 429 U.S. 589, 599 (1977); Doe v. Delie 257 F.3d 309, 315 (3d Cir. 2001).[5] Once a right is clearly established, qualified immunity will only shield a state actor such as Keen from liability where his actions are "reasonable" in light of the circumstances. There can be absolutely no argument that Keen's actions were reasonable where he failed to follow clearly established procedures under Pennsylvania law. Further, Keen's own testimony does not support the conclusion that his actions were motivated by any legitimate concern for public safety or otherwise. Instead, he argues only that he had a concern about Mr. Galle driving (Exhibit B, Keen deposition at 21). Interestingly, DGS argues that it never required Mr. Galle to drive in his position as Clerk I. Even more telling, only after this alleged "concern" for public safety arose, Mr. Galle's job description was changed by

---

[5] While plaintiff does not allege a violation of the Americans with Disabilities Act (ADA), the fundamental nature of the right to privacy of ones medical information is reinforced by EEOC interpretive guidance for the ADA which provides that, "medical records. . . must be maintained in the confidential manner required by this part and must not be used for any purpose in violation of this part." See 29 C.F.R. § 1630.14(d).

16

defendants to reflect that he must posses a valid driver's license (Exhibit A, Galle Deposition at 187-188).

**CONCLUSION**

For all of the above reasons, defendants' motion for summary judgment must be

denied, and the parties must be permitted to proceed to trial to resolve their ample, material factual disputes.

Respectfully submitted,

_____
JAMIE C. RAY, ESQUIRE
STEPHEN S. PENNINGTON, ESQUIRE
Attorney ID Nos. 84132, 31612
1617 J.F.K. Blvd., Suite 800
Philadelphia, PA  19103
(215) 564-9090

GERALD J. WILLIAMS, ESQUIRE
WILLIAMS, CUKER & BEREZOFSKY
1617 J.F.K. Boulevard, Suite 800
Philadelphia, PA  19103
(215) 557-0099

DATED: